No. 84–5843. PATTERSON *v.* SOUTH CAROLINA; and
No. 84–5850. KOON *v.* SOUTH CAROLINA. Sup. Ct. S. C. Certiorari denied. Reported below: No. 84–5843, 285 S. C. 5, 327 S. E. 2d 650; No. 84–5850, 285 S. C. 1, 328 S. E. 2d 625.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

In spite of this Court's repeated declarations that a capital "'sentencer . . . not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character . . . that the

defendant proffers as a basis for a sentence less than death,'"
*Eddings* v. *Oklahoma,* 455 U. S. 104, 110 (1982) (quoting *Lockett*
v. *Ohio,* 438 U. S. 586, 604 (1978)), the South Carolina Supreme
Court has determined that evidence of a capital defendant's likely
nondangerousness within a prison environment is legally irrele-
vant to the capital sentencer's choice between death or life in
prison. In these cases, the petitioners were sentenced to death.
They had offered such evidence in mitigation of death but were
denied the opportunity of submitting the evidence to their sen-
tencing juries.

The death sentences in these cases were imposed in glaring
violation of two lines of this Court's capital sentencing jurispru-
dence. First, and most obviously, the sentences are contrary to
the *Lockett-Eddings* line of authority, which makes unmistakably
clear that it is for the sentencer to determine the weight to be
given to proffered evidence of mitigation. Second, they are
equally in conflict with those decisions of this Court that make
equally clear that the question of a capital defendant's future dan-
gerousness is a legitimate penological concern relevant to a capital
sentencing hearing. See *California* v. *Ramos,* 463 U. S. 992,
1001–1003 (1983); *Barefoot* v. *Estelle,* 463 U. S. 880, 896–905
(1983); *Jurek* v. *Texas,* 428 U. S. 262, 274–276 (1976).

While this latter group of cases affirmed the penological rele-
vance of future dangerousness in contexts in which the State
urged it as a factor in aggravation, the hitherto relevant factor of
future dangerousness cannot become suddenly and cruelly "irrele-
vant" as a matter of law when a defendant wishes to assert its
absence as a factor in mitigation. As was declared in a precursor
to *Lockett* and *Eddings,* "a jury must be allowed to consider on
the basis of all relevant evidence not only why a death sentence
should be imposed, but also why it should not be imposed."
*Jurek* v. *Texas, supra,* at 271. Rather than allow *Lockett* and
*Eddings* to be eroded through such a cruelly inequitable view of
relevance, I would grant these petitions.[1]

---

[1] I continue to adhere to my view that the death penalty is in all circum-
stances cruel and unusual punishment prohibited by the Eighth and Four-
teenth Amendments. *Gregg* v. *Georgia,* 428 U. S. 153, 231 (1976) (MAR-
SHALL, J., dissenting). But even if I did not take this view, I would grant
review in these cases because of the important issue raised concerning the
proper interpretation of *Lockett* and *Eddings.*

Unfortunately, this case is illustrative of a disturbing trend in a number of
state courts to read our holdings in *Eddings* and *Lockett* in an unjustifiably

### I

At the time of the sentencing hearings in question the South Carolina Supreme Court's view of the relevance of predictive evidence as to a defendant's future nondangerousness in a prison environment was clear:

> "The penalty phase of a capital murder case is concerned with the existence or nonexistence of mitigating or aggravating circumstances involved in or arising out of the murder, not the convicted murderer's adaptability to prison life. The jury is concerned with the circumstances of the crime and the characteristics of the individual defendant as they bear logical relevance to the crime. . . . In *Lockett* v. *Ohio*, . . . cited as controlling in *Eddings* v. *Oklahoma*, . . . the United States Supreme Court retained the court's traditional authority to exclude irrelevant evidence which did not bear on a defendant's character, prior record, or the circumstances of his offense. We conclude that the evidence of appellant's future conformity to prison life was properly excluded as irrelevant." *State* v. *Koon*, 278 S. C. 528, 536, 537, 298 S. E. 2d 769, 773–774 (1982) (hereinafter *Koon I*).[2]

At Koon's hearing below, his counsel sought to develop a number of avenues of mitigating evidence. First, he sought to call two prison officials to testify as to petitioner's excellent record in prison and his demonstrated ability to adapt to prison life. Record in No. 84–5850, pp. 922–927. Second, he sought to call psychiatric experts to testify as to Koon's mental condition. Those psychiatrists had examined him and were prepared to testify that he suffered from a severe mental disorder, and that partly as a result of that disorder he was extremely capable of

---

narrow manner, and to declare, in spite of these holdings, that an increasing number of proffered bases of mitigation are simply irrelevant. See *Boyd* v. *North Carolina*, *ante*, p. 1030 (MARSHALL, J., dissenting from denial of certiorari); *Eutzy* v. *Florida*, *post*, p. 1045 (MARSHALL, J., dissenting from denial of certiorari).

[2] This ruling by the South Carolina Supreme Court occurred in an appeal of an earlier sentencing of petitioner Koon. In both of these cases the capital defendants had previously been sentenced to death pursuant to proceedings that were later found by the South Carolina Supreme Court to violate state law. *State* v. *Patterson*, 278 S. C. 319, 295 S. E. 2d 264 (1982); *Koon I*. Both had thus been imprisoned for a substantial period at the time of their resentencing hearings.

adapting to prison life. They would have testified that, within the highly structured and regulated context of life in prison, Koon would be unlikely to present any problem of future dangerousness, and that, indeed, he might live a more productive life than he was capable of living outside of confinement. *Id.*, at 925–928. See also *id.*, at 1062–1066.[3]

The trial court, relying on *Koon I*, excluded all of the prison officers' testimony, and all psychiatric evidence of Koon's ability to adapt to prison life or of his likely future nondangerousness within the prison environment. Although Koon was allowed to

---

[3] At the sentencing hearing at issue in the instant case, Koon made a proffer that his psychiatric expert would testify to substantially the same effect as the expert had done in the hearing that resulted in *Koon I*, *supra*. The following testimony by Dr. Pattison, an expert psychiatric witness, was proffered in mitigation at that earlier hearing:

"Q: You have observed Paul in his prison environment—his jail environment. Do you have an opinion as to his ability to adapt to a long term institutional environment?

"A: Yes. Both from the records and from observing him in the jail and talking with him it is, I think, quite clear in my professional opinion that he adapts very well to an institutional environment. As a matter of fact, in my professional judgment, in an institutional environment he has performed at probably his highest levels of function during his adult life, in as much as that environment is supportive, protective and has a relatively low level of stress compared to life in the outside world. Therefore, in this case I would be willing to risk a professional prediction in that I would predict that he would make an overall excellent institutional adjustment on a long term basis . . . .

"Q: Do you think Paul would be a violent person in an institutionalized environment?

"A: Again, in my professional opinion I feel confident in a reasonable frame to conclude that he would not be violent or dangerous within a custodial institution. The basis for my opinion is his past record within the custodial environment, his ability to conform within that environment, not only to maximum seclusion, but also conforming to the rules and regulations when he was under minimal supervision. Furthermore, his past history and his present state suggests that he performs interpersonally much better with men. That his major provocations of explosive and assaultive behavior is with women rather than with men. Therefore, I conclude that he would be a very good risk for good adjustment in an institution and a very low risk for assaultive or violent behavior in an institutional setting.

"Q: He could be, in your opinion, could he be a contributive [sic] member to a prison institution?

"A: Again, for the same reasons, I would say yes, in my professional opinion." Pet. for Cert. in No. 84–5850, pp. 6–7.

call a psychiatric witness to testify about his general psychiatric makeup, questions concerning adaptability or future nondangerousness were prohibited. The witness did briefly refer to petitioner's successful adaptation to prison life in responding to a question only tangentially related to that issue; petitioner's counsel was obviously unable to either develop this issue to any extent or to draw the jury's attention to it in his summation.

In *Patterson*, the facts are quite similar. Petitioner proffered evidence from prison authorities that he had an exemplary prison record during the period of almost three years since his earlier trial, and proffered evidence from a psychiatrist that individuals exhibiting a personality pattern similar to petitioner's "usually make a satisfactory adjustment to prison life" so that the likelihood of future violence by such persons "diminishes with the passing of time." Record in No. 84–5843, p. 1442. The trial court excluded all this evidence as irrelevant under the authority of *Koon I*. Thus, the sentencing jury was given no opportunity at all to consider either petitioner's behavior in prison or the issue of petitioner's likely future nondangerousness within a prison environment.

On appeal, both of these petitioners' death sentences were affirmed by the State Supreme Court on a slight variation of the *Koon I* rationale. 285 S. C. 5, 327 S. E. 2d 650 (1984); 285 S. C. 1, 328 S. E. 2d 625 (1984). Following *Koon I*, the court held that all predictive evidence of Patterson's future behavior in prison was simply irrelevant. It modified *Koon I* only to the extent that it held that the bare facts of Patterson's past prison record would now be considered admissible as general personal history. It read *Lockett* and *Eddings* as saying that a defendant's "character" was relevant mitigating evidence that can be shown through evidence of past behavior. It thus found that it had been error for the trial court to exclude the prison officers' testimony concerning Patterson's prior prison behavior. But since such behavior was relevant only to show a generally good character, the court held that it was merely cumulative of other general character evidence submitted by the petitioner.[4]

---

[4] The character evidence that the court found was cumulative to Patterson's evidence of his prison record was the testimony of a former employer that Patterson was a good and responsible worker and general testimony by Pat-

Similarly, in Koon's appeal below, the State Supreme Court held that the evidence of future nondangerousness was properly excluded. Prison officials' testimony as to Koon's prison record was relevant, but again, was properly excluded as cumulative since the psychiatrist had briefly, in an unresponsive answer, stated that petitioner had been doing quite well in prison.

In both of these cases, the capital defendants were limited to argue the most vague and general theories of mitigation. Their chosen theories were completely excluded from the jury's consideration. The State Supreme Court declared that it was irrelevant, as a matter of law, to argue that a death sentence might be inappropriate where a defendant could be relied on to lead an unthreatening life, and even a somewhat productive life, if kept in prison.[5]

## II

The constitutionality of these sentences rests on the premise that a State can make irrelevant to the capital sentencing process, as a matter of law, the theory of future nondangerousness that was proffered in mitigation by petitioners. The State's reasoning was that the proffered factor does not "aris[e] out of the murder" nor "bear logical relevance to the crime." *Koon I*, 278 S. C., at 536, 298 S. E. 2d, at 774. Put another way, the State viewed the factor as irrelevant because its proof would not reduce the moral culpability of the defendant. But this Court has never limited the circumstances relevant to a capital sentencing determination to those going to moral culpability. Quite the contrary, this Court has repeatedly treated predictive evidence relating to future dangerousness as highly relevant to sentencing concerns.

___

terson's relatives to the effect that he had been a good child and was still a "wonderful person" who had been led by bad influences to commit a murder that was out of character for him.

[5] The fact that in both of these cases the state court held that the proffered evidence of prior prison behavior was "cumulative" cannot save either of these decisions from review. In both cases, the theory of future nondangerousness was deemed irrelevant and the evidence and argument which would have been necessary to its proof were excluded. The determinations of "cumulativeness" whatever their merits, cf. *Chapman v. California*, 386 U. S. 18 (1967), were determinations that rested on the predicate federal determination that the only basis for the relevance of the evidence was to show general good character.

The most glaring is *Jurek* v. *Texas*, 428 U. S. 262 (1976), where this Court upheld a state law requiring capital sentencing juries to consider the issue of future dangerousness. The opinion announcing the judgment there declared:

> "It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system. . . . *And any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose.* . . . The task that a [capital sentencing] jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice. *What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine.*" *Id.*, at 274–276 (emphasis added).

The Court has treated evidence of future dangerousness as relevant even where the evidence at issue seemed of much less predictive value than the evidence at issue here. In both the instant cases, the witnesses who were excluded had all had extensive contact with the defendants and were testifying only to the likely behavior of the defendants within the same environment as that in which they had made their observations. In contrast, in *Barefoot* v. *Estelle*, 463 U. S. 880 (1983), this Court approved of the relevance of expert psychiatric predictions of future dangerousness even where the expert witness was testifying based on hypotheticals without ever having examined the defendant. *Id.*, at 903–906. If that evidence was relevant to capital sentencing, how can the evidence at issue in the instant cases be deemed irrelevant? See also *California* v. *Ramos*, 463 U. S. 992 (1983).

### III

Of course there are two differences between these earlier cases and the instant cases. First, relevance in the earlier cases was urged on the sentencers by prosecutors, who called for death sentences on the theory that the defendants at issue might be violent in the future. Here, evidence of the absence of future dangerous-

ness is offered as a reason for urging that the defendants not be sent to die. But this difference can hardly be a relevant one. A system of punishment would certainly be fundamentally unfair if it accepted the validity of a call for death where a factor was present, but declared that that factor's absence could not be offered as a reason for life. Such situation cannot be tolerated by the Eighth Amendment.

The second difference is that discussions of future dangerousness in our prior cases have emphasized the defendant's dangerousness to the society outside of jail, while here the emphasis was on the likely nondangerousness of the defendants' future behavior within jail. But although this might be viewed as an important distinction by a sentencer, it cannot be rationally viewed as a distinction that makes nondangerousness in prison irrelevant as a matter of law. If a jury can base a sentencing determination on predictions of the possible dangerousness of a defendant at the point far in the future when, after a long confinement, he might be paroled or pardoned, a jury cannot be precluded from considering the more immediate issue of his future dangerousness during that quite lengthy period when he will remain in jail. Similarly, it would be the ultimate cynicism to adopt a conclusive presumption that a sentencing jury would simply be wholly uninterested in the possible dangers that a killer who continues to be violent might present to other inmates—or conversely—that the jury would be wholly unimpressed by the fact that a different criminal might present no dangers to those inmates.

Ultimately, the evidence offered in mitigation here was premised on the proper notion that a jury might confront in a serious and humane way the question of what is actually to be gained and lost by a verdict of death. While in some cases the cry for moral retribution may sound clear to the jury, in others it may not. In the latter cases, it may be quite effective, as it would always be legitimate, to remind the jury that an execution may generate little social benefit and, indeed, may generate substantial social loss. A jury may come to see that a prisoner's life in prison has some substantial social worth. He may adapt to his environment, find some degree of community in it, and contribute in some way to that community. He may even come to live a life of greater meaning than that which he knew before his confinement. Should a sentencer believe that there is a chance that these may be the consequences of a rejection of a death sentence, these factors may

become powerful factors of mitigation. South Carolina's determination that they are simply irrelevant cannot stand.