[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 20, 2012
JOHN LEY
CLERK

_____

No. 11-11199

_____

D.C. Docket No. 8:09-cv-00377-EAK-TGW


ALVIN LEROY MORTON,

                    Petitioner - Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

                    Respondents - Appellees.


_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 20, 2012)

Before DUBINA, Chief Judge, WILSON and PRYOR, Circuit Judges.

PRYOR, Circuit Judge:

       This appeal illustrates the truism that, regardless of the mitigation strategy

that capital defense lawyers choose, they are often "damned if they do, and damned if they don't" when their clients later assert claims of ineffective assistance of counsel during collateral review. After he confessed to butchering an elderly woman with a survival knife and shooting her defenseless son at point-blank range with a sawed-off shotgun during a random home invasion, Alvin Morton was convicted and sentenced to death. During the two penalty phases that occurred after Morton was convicted, Morton's counsel presented expert testimony that Morton's troubled childhood caused him to develop an antisocial personality disorder, which led him to commit the murders. Defense counsel argued that this disorder mitigated Morton's moral culpability for the murder, but the jury rejected this argument and sentenced Morton to death. Although habeas petitioners routinely argue to this Court that their lawyers rendered ineffective assistance by not presenting evidence of an antisocial personality disorder, see, e.g., Reed v. Sec'y, Fla. Dep't for Corr., 593 F.3d 1217, 1245–49 (11th Cir. 2010); Cummings v. Sec'y for the Dep't of Corr., 588 F.3d 1331, 1365–68 (11th Cir. 2009); Parker v. Sec'y for the Dep't of Corr., 331 F.3d 764, 781–90 (11th Cir. 2003); Thompson v. Nagle, 118 F.3d 1442, 1451–52 (11th Cir. 1997), Morton argues that his trial lawyers rendered ineffective assistance because they presented evidence that Morton had an antisocial personality disorder. This argument fails.

2

The Supreme Court of Florida reasonably applied <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984), when it rejected Morton's claim. We affirm the denial of Morton's petition for a writ of habeas corpus.

## I. BACKGROUND

On Super Bowl Sunday in 1992, while millions of American enjoyed watching the football game between the Washington Redskins and the Buffalo Bills, Morton and two of his friends, Bobby Garner and Tim Kane, perpetrated a horrific crime for their own violent entertainment. The three friends approached the home of 75 year-old Madeleine Weisser and her 55 year-old son, John Bowers. Although both Weisser and Bowers were strangers to them, Morton and his friends broke into their home and murdered the mother and son for no apparent reason.

During a tape-recorded confession to the police that was played for the jury, Morton described the cold-blooded and senseless murders in graphic detail. Morton stated that he and his accomplices approached the house with an eight and three-quarter inch "survival knife" and a shotgun. Morton stated that "nothing" in particular made them decide to go to the home of Weisser and Bowers, but when they arrived there, Kane cut the telephone line. After Morton kicked in the front door, they entered the home. When Bowers confronted Morton and his

accomplices in the home, Morton "told him to get on the ground and he did." When Weisser entered the room, Garner ordered her to the floor too. Bowers attempted to arise, but Morton told him to stay down. When Bowers refused, Morton shot him "right in the neck." After her son had been shot at point-blank range, Weisser too attempted to lift herself off the ground, but Garner kicked her in the ribs. Garner "stomped on [Weisser's] head," and Morton "stuck the knife to her neck and told her [to] stay down." When Weisser refused, Morton "tried to push [the knife] in," but the knife "hit the bone and stopped." Morton stated that Garner "pushed [the knife] down real hard with . . . he's fat . . . with all his weight, and it just went right through." Garner cut off Bowers's pinkie finger. Morton and the two other murderers fled the scene and showed Bowers's severed finger to one of their friends as proof that they had committed murder.

Other evidence presented at trial corroborated Morton's confession and provided additional details concerning the murders. Morton planned the home invasion and murders days before he carried out the crimes, and two days before the murders, he told a friend that he would bring back a human body part as proof that he had committed murder. Morton told others that Bowers had asked him, "[W]hy are you doing this, what did we do to deserve this[?]" The victims told Morton he could take anything he wanted, if he would spare them, and that they

4

would not report him to law enforcement. Morton responded, "[t]hat's what they all say," and then shot Bowers. Weisser was stabbed eight times, and she had defensive wounds that established that she had faced her attackers and would have been aware of the brutality inflicted upon her. Morton and his accomplices severed Weisser's spinal cord.

Gary Urso and John Swisher represented Morton at both the guilt and penalty phases of the trial. Urso had prosecuted capital murder cases, but he had never represented a capital defendant. Swisher had defended capital cases. Swisher was in charge of the guilt phase, and Urso was in charge of the penalty phase. On February 4, 1992, a jury convicted Morton of the first degree murders of Weisser and Bowers.

Urso and Swisher decided to pursue an "unbonded child" theory of mitigation during the penalty phase. In other words, Urso and Swisher decided to argue that Morton had not been nurtured as an infant and had been raised in a dysfunctional family to explain why he had committed murder at the age of 19. In preparation for the penalty phase, Urso talked to Morton and Morton's mother. Morton's mother mailed Urso a letter in which she explained that Morton was deprived of oxygen at birth because the umbilical cord was wrapped around his neck. She stated that, when Morton was born, he was black and blue. Morton's

5

mother also wrote in the letter that the doctors present at Morton's birth determined that he was not retarded. Urso also talked to Morton's sister, Angela, and he hired Mimi Pisters, a social worker, who interviewed witnesses about Morton's childhood. Morton's mother, Angela, and Pisters all testified at the original penalty phase along with other lay witnesses for the defense.

Urso filed a motion to obtain a confidential mental health expert. Urso retained Dr. Donald DelBeato, a psychologist, with whom Urso had worked with for several years. Urso believed that Dr. DelBeato was "extremely competent." Urso testified that he thought Dr. DelBeato was the "most respected psychologist . . . who testifies in our courts in New Port Richey, maybe Dade City." Dr. DelBeato interviewed Morton, performed a battery of psychological exams, and prepared a report that he delivered to Urso.

Based on his interview with Morton, Dr. DelBeato concluded that Morton was raised in a dysfunctional household as a child. Morton told Dr. DelBeato that "his natural mother and father were divorced when [Morton] and his sister were very young," "his father was an alcoholic," and "he did not have much contact with his biological father." Although Morton's mother remarried, Morton "did not appear to develop any strong bonding relationship with" her new husband. Dr. DelBeato determined that Morton had "no significant or strong male models" and

6

"[t]here was no significant male guidance." Morton "did not feel closeness within the family," but he loved his sister and mother. Dr. DelBeato concluded that Morton was "a person who is rather shy, isolative and withdrawn and a loner. A very lonely, aimless and drifting person."

Dr. DelBeato diagnosed Morton with "a mixed personality disorder." According to Dr. DelBeato, "[l]iterature suggest[ed] that [Morton's] profile shows a person who does not form close relationships either with female or males," which "fit[] with [Morton's] expressed background." Dr. DelBeato concluded that Morton had "emotional instability and personality deficits that appeared to have developed in line with a rather dysfunctional family history where he was rather alone, relatively unsupervised and with no significant male bonding or male model." Dr. DelBeato concluded that "[w]ithout this supervision and guidance [Morton's] ability to develop into a more fully functioning individual was extremely limited."

Dr. DelBeato testified at the first penalty phase and provided a scientific explanation of the bonding process. Dr. DelBeato testified that "[t]he bonding process is . . . a process whereby a person begins to develop from superficial or reflexive, even, conditioning to a deep form of conditioning feeling in a sense between mother and child." He stated that "the process of bonding, affection and

7

nurturance is extremely important from age one or age three to age nine or ten, as an extremely significant period." Dr. DelBeato testified that, "[i]f [a] person does not receive appropriate nurturing, touch, feel, talk, calm, they could develop a lack of or limitation in the ability to form empathy bonding." Dr. DelBeato explained that "abused children tend to become abusers." Dr. DelBeato stated that a child who is not bonded "[u]sually [becomes] an unattached, isolated, cold, withdrawn person who doesn't love, who doesn't have acquaintances, a distant—usually in this society we call it a personality disorder or a character disorder." He testified that Morton likely had trouble bonding because he did not have any strong male role models in his life when he was a child. He stated that Morton was raised in a dysfunctional family. Although Dr. DelBeato testified that Morton denied being physically abused, he explained that "[p]eople deny abuse out of shame."

Dr. DelBeato also delivered testimony that might have undermined Morton's plea for mercy. Dr. DelBeato stated on direct examination that "especially between the ages of three and nine, every, for example, every male serial killer that has been found, tried and convicted, the majority of them, I think it's every, but it may be a percentage, has had no significant male figure in their lives between age three and nine." On cross-examination, Dr. DelBeato stated that, in his opinion, Morton was a sociopath. He described a sociopath as "a

8

person who does show anti-social tendencies, personality dysfunction and character disorders where they tend to have a deficit in conscience and a deficit in feeling." Dr. DelBeato testified that "[g]iven the state of the art and what we know, I would have a difficult time saying we could cure [Morton's] disorder."

The jury recommended a sentence of death on both counts by a vote of 11 to 1, and the trial court sentenced Morton to death. On direct appeal, the Supreme Court of Florida affirmed the convictions, but vacated the sentences due to prosecutorial misconduct and remanded for a new penalty proceeding. Morton v. State (Morton I), 689 So. 2d 259, 265 (Fla. 1997).

Before the retrial, Swisher sent a letter to Urso stating that Dr. DelBeato was "not a great witness" because of his testimony that Morton denied physical abuse, but Urso sent Dr. DelBeato a letter asking him to testify at the retrial. Dr. DelBeato replied to Urso that "[r]ight now you have your pick of times, but I don't think it's a good idea to use me." Urso testified that he spoke to Dr. DelBeato and told him "we need you, because you are going to present the personality characteristics that are necessary to the theory of our case, and while I understand you're afraid you're going to hurt [Morton's] case, that's the theory of our case." Urso and Swisher attempted to investigate whether Morton had brain damage before the retrial, but Morton told them that "he didn't want any more testing."

9

Dr. DelBeato testified again and presented substantially the same testimony that he provided during the first trial of the penalty phase.

During the retrial of the penalty phase, Urso and Swisher also presented moving testimony about Morton's troubled childhood. Morton's mother, Barbara Stacy, testified that Morton had to spend a substantial amount of time alone in the hospital when he was a baby without his mother, and that he was a sickly child. She stated that Morton's biological father would brag to Morton about how he had murdered a person, and he threatened to murder Morton. She testified that Morton's father was physically abusive to him as an infant and that the violence continued until she divorced the father. Stacy testified that the family moved often and Morton had few friends. Stacy testified that she divorced Morton's father after she caught him having sex with their daughter. Morton was about eight years old when the divorce happened. Morton's sister, Angela White, testified that their father drank every day and was physically abusive. Angela confirmed that her father had sexually abused her. Urso and Swisher also presented the testimony of Mimi Pisters, a social worker, and other lay witnesses who described Morton's troubled childhood.

During the retrial of the penalty phase, a new jury again recommended death on both counts by a vote of 11 to 1. Morton v. State (Morton II), 789 So. 2d 324,

328 (Fla. 2001). The sentencing court applied three aggravating circumstances as to the murder of Bowers and assigned great weight to each: "(1) the murder had been committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification . . . ; (2) the homicide was committed while Morton was engaged in the commission of, or an attempt to commit, a robbery or burglary or both; and (3) the homicide was committed for the dominant purpose of avoiding or preventing a lawful arrest." Id. As to the murder of Weisser, the sentencing court applied five aggravating circumstances and also applied great weight to each: "(1) the homicide was committed in an especially heinous, atrocious, or cruel manner . . . ; (2) Morton was previously convicted of another capital felony, i.e. murdering Bowers; (3) ]the murder had been committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification]; (4) the homicide was committed while Morton was engaged in the commission of, or an attempt to commit, a robbery or burglary or both; and (5) the homicide was committed for the dominant purpose of avoiding or preventing a lawful arrest." Id. at 328–29. The sentencing court also applied two statutory mitigating circumstances: "(1) Morton's age of nineteen (little weight); and (2) Morton's lack of significant history of prior criminal activity (some weight)." Id. at 329. And the sentencing court applied five nonstatutory mitigating

11

circumstances, but assigned little weight to each: "(1) Morton was a product of a dysfunctional family . . . ; (2) Morton had minimal physical contact with his mother during the first four weeks of his life . . . ; (3) Morton's family moved in and out of state on a regular basis, disrupting any stable home and social life . . . ; (4) Morton suffered from repeated physical and mental abuse committed by his alcoholic father up until Morton was eight years old . . . ; and (5) Morton voluntarily confessed and cooperated with the police . . . ." Id. The sentencing court ruled that the aggravating circumstances outweighed the mitigating circumstances and imposed a sentence of death for the murder of each victim. Id. at 328. The Supreme Court of Florida affirmed Morton's sentences. Id. at 327.

Morton then filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.851, and Morton filed a petition for a writ of habeas corpus. Morton v. State (Morton III), 995 So. 2d 233, 236–37 & n.7 (Fla. 2008), in which he raised one issue relevant to this appeal: "whether the trial court erred in rejecting Morton's claim that trial counsel rendered ineffective assistance during the penalty phase of his trial." The trial court held an evidentiary hearing. Urso, Swisher, and DelBeato testified for the state.

Morton called two mental health experts, Claudia Baker and Dr. Arturo Silva in support of his motion. Baker, a social worker, reviewed records from

12

Morton's childhood and interviewed witnesses. She testified that "biological factors" revealed in the records and interviews "should have prompted further investigation into organic brain dysfunction." After reviewing records and the interviews that Baker had conducted, Dr. Silva conducted a battery of psychological tests on Morton. Dr. Silva diagnosed Morton with Asperger's syndrome and "explained that [Morton] has feelings or emotions but has substantial difficulty experiencing feelings or emotions." Dr. Silva testified that there is "research which has established that people with Asperger's have problems in the frontal lobe, the prefrontal lobe and maybe also the amygdala" and that it is this "brain impairment that substantially impairs Alvin's ability to have empathy and remorse." The trial court denied Morton's motion for collateral relief. Id. at 237. The Supreme Court of Florida affirmed the denial of Morton's motion, and it denied his petition for a writ of habeas corpus. Id. at 247.

Morton filed a petition for a writ of habeas corpus in the district court, and later filed a second amended petition. Morton raised 16 grounds for relief in his second amended petition. The district court denied Morton's petition for a writ of habeas corpus, denied a certificate of appealability, and entered judgment against Morton.

We granted Morton's application for a certificate of appealability with respect to one issue: Whether the Supreme Court of Florida unreasonably applied clearly established federal law, as determined by the Supreme Court of the United States, when it determined that Morton's attorney at his second penalty phase hearing made a reasonable strategic decision to present the expert testimony of Dr. DelBeato, a mental health expert who had provided some damaging testimony during the first penalty phase.

## II. STANDARD OF REVIEW

Morton's petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996, which establishes a "general framework of substantial deference [that] governs our review of every issue that the state courts have decided." Diaz v. Sec'y for the Dep't of Corr., 402 F.3d 1136, 1141 (11th Cir. 2005). We will not disturb the decision of the state habeas court unless the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see also McClain v. Hall, 552 F.3d 1245, 1250 (11th Cir. 2008). The Supreme Court has held that § 2254(d)(1) imposes a "'highly deferential standard for evaluating state-

14

court rulings,' a standard 'which demands that state-court decisions be given the benefit of the doubt.'" Rutherford v. Crosby, 385 F.3d 1300, 1306–07 (11th Cir. 2004) (quoting Woodford v. Visciotti, 537 U.S. 19, 24, 123 S. Ct. 357, 360 (2002)). "A state court decision involves an unreasonable application of federal law when it identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case," Spencer v. Sec'y, Dep't of Corr., 609 F.3d 1170, 1178 (11th Cir. 2010) (internal quotation marks omitted), or when it "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context," Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).

To determine whether the state court unreasonably applied clearly established federal law in adjudicating Morton's habeas petition, this Court must conduct the two-step analysis that the Supreme Court stated last year in Harrington v. Richter, --- U.S. ----, 131 S. Ct. 770 (2011). First, this Court "must determine what arguments or theories supported or, [if none were stated], could have supported the state court's decision." Johnson v. Sec'y, Dep't of Corr., 643 F.3d 907, 910 (11th Cir. 2011) (quoting Harrington, --- U.S. at ----, 131 S. Ct. at 786.) (alteration in original) (internal quotation marks omitted). Second, this Court "must ask whether it is possible fairminded jurists could disagree that those

15

arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. (alteration in original) (internal quotation marks omitted). In other words, we may issue a writ of habeas corpus only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Harrington, --- U.S. at ----, 131 S. Ct. at 786.

### III. DISCUSSION

Because Morton argues that his trial lawyers rendered ineffective assistance of counsel, Morton must establish both that trial counsel's "performance was deficient, and that the deficiency prejudiced the defense." Wiggins v. Smith, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003); see also Strickland, 466 U.S. 668, 104 S. Ct. 2052. Deficient performance occurs when "counsel's representation [falls] below an objective standard of reasonableness . . . under prevailing professional norms." Wiggins, 539 U.S. at 521, 123 S. Ct. at 2535. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066. Prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial." Id.

16

We must ask whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In the context of a challenge to a sentence of death, the question is whether "there is a reasonable probability that [the judge and jury] would have returned with a different sentence." Wiggins, 539 U.S. at 536, 123 S. Ct. at 2543. "To assess that probability, we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweig[h] it against the evidence in aggravation." Porter v. McCollum, --- U.S. ----, 130 S. Ct. 447, 453–54 (2009) (internal quotation marks omitted) (alteration in original). "The likelihood of a different result must be substantial, not just conceivable." --- U.S. at ----, Harrington, 131 S. Ct. at 791–92.

Because "[t]he standards created by Strickland and § 2254(d) are both highly deferential," it follows that "when the two apply in tandem, review is doubly so." Harrington, --- U.S. at ----, 131 S. Ct. at 788 (internal quotation marks and citations omitted). Federal habeas courts assessing claims of ineffective assistance previously adjudicated in state court "must guard against the danger of equating unreasonableness under Strickland with unreasonableness under §

17

2254(d)."  Id.  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."  Id.

We divide our discussion into two parts.   First, we address Morton's arguments that Urso and Swisher rendered deficient performance when they called Dr. DelBeato to testify at the resentencing.  Second, we address Morton's argument that he suffered prejudice as a result of the alleged deficient performance of Urso and Swisher.

### A.  The Supreme Court of Florida Did Not Unreasonably Apply Clearly Established Federal Law When it Ruled that Morton's Lawyers Did Not Render Deficient Performance.

Morton advances three arguments concerning why the Supreme Court of Florida unreasonably applied clearly established federal law when it ruled that Urso and Swisher did not render deficient performance when they called Dr. DelBeato to testify at the resentencing.  First, Morton argues that capital defense lawyers necessarily render deficient performance whenever they present evidence that a capital defendant has an antisocial personality disorder for purposes of mitigation.  Second, he argues that, even if evidence of antisocial personality disorder can be offered in mitigation, it was unreasonable for Urso and Swisher to call Dr. DelBeato to offer this diagnosis at the resentencing knowing that he had

18

already testified that Morton was a sociopath, shared traits in common with serial killers, and could not be rehabilitated. Third, Morton argues that Urso and Swisher did not make a reasonable strategic decision to call Dr. DelBeato to testify at the resentencing because they failed to investigate other mental health theories. We address each argument in turn.

### 1. Capital Defense Lawyers Do Not Render Deficient Performance As A Matter of Law When They Present Evidence of a Defendant's Antisocial Personality Disorder.

Morton argues that Urso and Swisher rendered deficient performance when they called Dr. DelBeato to testify at the retrial of the penalty phase because antisocial personality disorder "is no more mitigating than being 'evil' is mitigating," but we disagree. Habeas petitioners routinely ask us to rule that they received ineffective assistance when their trial lawyers failed to present evidence of an antisocial personality disorder, see, e.g., Reed, 593 F.3d at 1245–49 ; Cummings, 588 F.3d at 1365–68; Parker, 331 F.3d at 781–90; Thompson, 118 F.3d at 1451–52, so Urso and Swisher chose a mitigation strategy that many postconviction lawyers contend can be effective. Although we have stated that evidence of antisocial personality disorder is "not 'good' mitigation," Reed, 593 F.3d at 1246, we have never ruled that a capital defense lawyer renders ineffective assistance as a matter of law when he introduces evidence of antisocial personality

19

disorder for mitigation purposes. And for good reason. In Eddings v. Oklahoma, the Supreme Court of the United States explained that "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 455 U.S. 104, 110, 102 S. Ct. 869, 874 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S. Ct. 2954, 2964 (1978)) (alteration and emphasis in original) (internal quotation marks omitted). And the Supreme Court ruled that a sentencing court violated the constitutional rights of the defendant by failing to consider expert testimony that the defendant had an "antisocial personality." Id. at 107–08, 102 S. Ct. at 873–74.

In the light of Eddings, there cannot be a per se rule that a lawyer renders ineffective assistance by presenting evidence of an antisocial personality disorder for purposes of mitigation. The Supreme Court of Florida, at Morton's urging, reasonably ruled that "antisocial personality disorder is a valid mitigating circumstance for trial courts to consider and weigh." Morton II, 789 So. 2d at 329–30 (citing Eddings, 455 U.S. at 110, 102 S. Ct. at 874). That a diagnosis of antisocial personality disorder has negative characteristics or presents a double-

20

edged sword renders it uniquely a matter of trial strategy that a defense lawyer may, or may not, decide to present as mitigating evidence.

### 2. The Supreme Court of Florida Reasonably Concluded that Urso and Swisher Satisfied the Deferential Standard of Strickland When They Called Dr. DelBeato to Testify Again.

Morton argues that, even if evidence of antisocial personality disorder can be introduced for mitigation, Urso and Swisher performed deficiently when they decided to call Dr. DelBeato to testify at the retrial of the penalty phase knowing that Dr. DelBeato had testified at the first penalty phase that Morton was a sociopath and shared traits in common with serial killers. Morton contends that the contrary ruling of the Supreme Court of Florida is an unreasonable application of clearly established federal law. We again disagree.

The Supreme Court of Florida reasonably applied clearly established federal law. There are reasonable arguments that Urso and Swisher "satisfied Strickland's deferential standard" when they called Dr. DelBeato to testify again knowing that he would give some unfavorable testimony. Harrington, --- U.S. at ----, 131 S. Ct. at 788. As the Supreme Court of the United States explained in Cullen v. Pinholster, "Strickland specifically commands that a court must indulge [the] strong presumption that counsel made all significant decisions in the exercise of reasonable professional judgment." --- U.S. ----, 131 S. Ct. 1388, 1407 (2011)

21

(internal quotation marks and alterations omitted). We are "required not simply to give the attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as they did." Id. (internal quotation marks, citation, and alterations omitted).

Urso and Swisher could have reasonably determined that Dr. DelBeato's expert testimony that Morton's childhood caused him to an develop antisocial personality disorder, which led Morton to murder Weisser and Bowers, was necessary to explain to the jury why Morton's childhood might mitigate his moral culpability for the two murders. As Justice Thurgood Marshall once explained, "[e]xpert knowledge of human motivation" can be "highly relevant in the eyes of the jurors, for it might . . . offer[] an alternative explanation for why [the petitioner] killed." Boyd v. North Carolina, 471 U.S. 1030, 1034, 105 S. Ct. 2052, 2054 (1985) (Marshall, J., dissenting from denial of petition for writ of certiorari). In the absence of expert testimony that explains how a murderer's troubled past could have led him to commit a gruesome crime, Justice Marshall explained that "scattered personal history evidence might have . . . little apparent significance," but "expert evidence might well . . . provide[] a link between the personal history evidence and that extenuation or reduction of the moral culpability of the killing that might call for a sentence of less than death." Id.

22

Expert testimony that Morton's traumatic childhood experience caused him to develop a psychological disorder that led him to murder an innocent elderly woman and her son would have provided context for Morton's mitigation case in the light of lay witness testimony presented during the resentencing. Morton's sister, Angela, testified during the resentencing that Morton suffered physical abuse from their father when Morton was a child. Angela also testified that their father raped her when she was a young girl. The problem for Morton's theory was that Angela suffered a more tragic childhood than Morton, but she was able to marry, find a job, and become a productive member of society. The horrors that Angela suffered during childhood did not cause her to become a murderer. Dr. DelBeato's expert testimony that Morton's troubled childhood caused him to develop a psychological disorder that led him to kill provided the jury with an explanation regarding why some people with troubled childhoods commit heinous crimes while others do not. Urso and Swisher could have reasonably decided that Dr. DelBeato's testimony was necessary to explain why Morton's childhood mitigated his moral culpability for the murders.

Urso and Swisher could have also reasonably decided to call Dr. DelBeato to testify at the retrial of the penalty phase to preempt any effort by the prosecution to prove the same thing. See Awkal v. Mitchell, 613 F.3d 629, 642 (6th Cir. 2010)

23

(en banc) ("[K]nowing that the prosecution was going to call [the expert] anyway, Awkal's counsel opted to call [the expert] as a witness to take some of the 'sting' out of [the expert's] adverse opinion by being able to present his favorable testimony first and by incorporating the negative testimony into Awkal's case-in-chief."). Florida law provides that the prosecution "shall be provided a full opportunity to rebut the existence of mitigating factors urged by [the defendant] and to introduce evidence tending to diminish their weight if they cannot be rebutted." Ellis v. State, 622 So. 2d 991, 1001 (Fla. 1993). With Dr. DelBeato's testimony from the first penalty phase in hand, any prosecutor worth his salt would have attempted to use the damaging parts of that testimony to argue to the jury that, far from being mitigating, the testimony of Morton's mother, sister, and others about Morton's troubled childhood established that Morton had traits in common with serial killers and was a sociopath who could not be rehabilitated. If Urso and Swisher had not called Dr. DelBeato during their case-in-chief, the prosecution could have argued that Urso and Swisher were hiding unfavorable information from the jury, which would have damaged their credibility. Instead of allowing the prosecution to magnify the harmful aspects of Dr. DelBeato's testimony, Urso and Swisher downplayed those aspects of Dr. DelBeato's testimony by calling him as a witness during their case-in-chief and

24

acknowledging the negative implications of his diagnosis of antisocial personality disorder.

### 3. In the Light of Morton's Statements that He Did Not Want Further Testing, There Are Reasonable Arguments that Urso and Swisher Satisfied the Deferential Standard of Strickland When They Did Not Pursue Different Mental Health Theories at the Resentencing.

Morton argues that the Supreme Court of Florida unreasonably applied clearly established federal law when it ruled that Urso and Swisher were not obliged to investigate other mental health mitigation evidence. Morton argues that competent counsel would have discovered evidence that Morton had brain damage and Asperger's syndrome. Morton's argument fails.

Urso and Swisher attempted to investigate whether Morton was brain damaged two years before the resentencing, but Morton refused to consent to any additional testing. At the postconviction evidentiary hearing, Swisher explained that he intended to pursue a brain damage theory in 1997, but Morton refused to undergo testing:

> **[Swisher]:** . . . I wrote a letter on May 5th of 1997, and I think I was appointed around April, but I'm not a hundred percent certain on that.
>
> May the 5th, I wrote a letter to Gary Urso in reference to some information that I witnessed or seen on television and some other articles that I had read.
>
> My letter indicates that this information may not have been available at

25

the time of the first trial, and I had suggested to him that we might want to pursue that.

In fact, I even put in a doctor's name to consult . . . Dr. Mayer over in Tampa.

. . .

**[Morton's counsel]:** What was the information that you read about or saw on television?

**[Swisher]:** It regards brain development is what my letter says, and some of it I said is visible through an MRI.

I also found in the file, I can't remember if these were furnished to me by Mr. Urso or if I furnished them to him, but there was the article about brain development in Newsweek magazine, and the date of that was the spring of '97.

I also had a newspaper article about brain power out of the Floridian, April of '97. The Newsweek article is Xeroxed, and it shows the date of February '96, and then I had a couple of other articles.

I think we discussed those. And as I remember it, it was going to require additional testing, and Mr. Urso asked Mr. Morton if he was willing to do that, and [Morton] said, no, he didn't want any more testing.

The Supreme Court of Florida reasonably concluded that Urso and Swisher made a reasonable decision not to pursue further investigation of Morton's mental health in the light of Morton's statement that he did not want any more mental health testing. "[I]n each case we must determine whether counsel conducted a reasonable background investigation 'or' made a reasonable decision that made

conducting a background investigation unnecessary." Johnson, 643 F.3d at 931 (citing Pinholster, --- U.S. at ----, 131 S. Ct. at 1407). As we have stated, "[w]hen a defendant preempts his attorney's defense strategy, he thereafter cannot claim ineffective assistance of counsel." Stano v. Dugger, 921 F.2d 1125, 1151 (11th Cir. 1991).

Morton argues that his lawyers should have disregarded his statements that he did not want to undergo an MRI or a PET to test for the presence of brain damage and should have had Morton "tested or evaluated by a neuropsychiatrist or neuropsychologist," but this argument fails. The record establishes that Morton "didn't want any more testing," not that he did not want an MRI or a PET scan. Morton states that there is "research which [sic] has established that people with Asperger's have problems in the frontal lobe, the prefontal lobe and maybe also the amygdala" and that it is this "brain impairment that substantially impairs Alvin's ability to have empathy and remorse," but he fails to explain how Urso and Swisher could have discovered this brain impairment without Morton's consent to more testing, which he refused.

Morton also argues that the decision of Urso and Swisher to call Dr. DelBeato to testify at the retrial of the penalty phase was unreasonable because the lawyers violated professional norms by failing to acquire Morton's medical and

school records, failing to seek releases from Morton, and failing to identify and interview more witnesses who could potentially provide mitigation evidence. He maintains that this failure to investigate prevented Urso and Swisher from searching for a witness who could testify about Morton's brain impairment and Asperger's syndrome. This argument fails.

Putting aside the fact that much of the information contained in the records, such as details from Morton's troubled birth, was already known to Urso and Swisher through other sources, including Morton's mother, the decision of Urso and Swisher not to investigate Morton's alleged brain impairment was not caused by a failure to obtain records: the decision was the result of Morton's adamant response that "he didn't want any more testing." Dr. DelBeato had tested Morton for brain damage and Swisher testified that he "specifically put[] in his report that the screening suggests no significant organic or thought impairment." Swisher testified that he "had a doctor that didn't lead me down that path, so I didn't go there." The ruling of the Supreme Court of Florida that Urso and Swisher did not render deficient performance was reasonable.

B.  The Ruling of the Supreme Court of Florida that Morton Was Not Prejudiced Was Reasonable.

Even if we were to rule that the Supreme Court of Florida unreasonably applied clearly established federal law when it concluded that Morton's lawyers did not render deficient performance, Morton would not be entitled to relief.  The Supreme Court of Florida reasonably applied clearly established federal law when it ruled that Morton failed to establish prejudice.  See Moody v. Polk, 408 F.3d 141, 147 (4th Cir. 2005) ("An error in a state court's analysis does not render the state court's decision contrary to or an unreasonable application of Supreme Court precedent when that analysis is not necessary to the state court's resolution of the claim.").  All of Morton's arguments to the contrary fail.

The Supreme Court of Florida reasonably concluded that there is no reasonable probability that the trial court would not have sentenced Morton to death if Dr. DelBeato had not testified again.  As the Supreme Court of Florida explained, the prosecution proved "substantial aggravation" against Morton.  Morton III, 995 So. 2d at 243.  "As to the murder of Bowers and Weisser, the [trial] court found: (1) [cold, calculated, and premeditated]; (2) the crime was committed during the commission of, or an attempt to commit, a robbery or burglary or both; and (3) the crime was committed for the dominant purpose of

29

avoiding or preventing a lawful arrest." Id. "As to the murder of Weisser, the [trial] court found the additional aggravations of [heinous, atrocious, and cruel] and prior capital felony based on the murder of Bowers." Id. The prosecution presented overwhelming evidence to establish these weighty aggravating factors, and Morton does not dispute any of that evidence. The mitigating evidence was weak.

Morton also argues that the Supreme Court of Florida "unreasonably applied clearly established federal law when it assessed prejudice comparing evidence adduced at both penalty phases," but we disagree. Although the Supreme Court of Florida stated in general terms that it had "compar[ed] the testimony presented at the penalty phases and evidentiary hearing," Morton III, 995 So. 2d at 238, the court did not state that it had weighed any evidence from Morton's original sentencing, id. at 241, 243–44. In the absence of any explicit statement that the Supreme Court of Florida impermissibly weighed evidence from the original sentencing, we must give the decision of the Supreme Court of Florida the benefit of the doubt. See Renico v. Lett, --- U.S. ----, 130 S. Ct. 1855, 1862 (2010). Indeed, in the light of Morton's argument that Urso and Swisher should not have called Dr. DelBeato to testify at the resentencing due to his testimony at the original penalty phase, it would have been odd if the Supreme Court of Florida

30

had not "compar[ed] the testimony presented at the penalty phases and evidentiary hearing" to determine whether Morton's argument had any merit.

Morton also argues that the Supreme Court of Florida unreasonably failed to consider the totality of the evidence when assessing prejudice because the court "never mentioned [that Morton] was only 19 years old while addressing the ineffective assistance of counsel claim or when summarizing the evidence at trial," but this argument misunderstands the deferential nature of our review. We must give the state court the benefit of the doubt. See Renico, --- U.S. at ----, 130 S. Ct. at 1862. Nothing in the decision of the Supreme Court of Florida establishes that the court failed to consider the mitigating evidence of Morton's youth, so we must presume that it considered that evidence.

Finally, Morton argues that the Supreme Court of Florida "unreasonably discounted and reduced to irrelevance counsel's failure to obtain and present evidence of Alvin's traumatic birth and resulting brain damage and Asperger's Disorder," but Morton's own decision forecloses this argument. Swisher testified at the evidentiary hearing that he and Urso wanted to present evidence at the resentencing that Morton suffered from brain damage, but Morton told Urso that "he didn't want any more testing." When a defendant prevents his trial counsel from presenting mitigating evidence, he cannot argue on collateral review that he

31

was prejudiced by the failure to present that evidence.  See Schriro v. Landrigan, 550 U.S. 465, 475, 127 S. Ct. 1933, 1941 (2007) ("If Landrigan [instructed his lawyer not to present mitigating evidence], counsel's failure to investigate further could not have been prejudicial under Strickland.").

## IV. CONCLUSION

We **AFFIRM** the denial of Morton's petition for a writ of habeas corpus.