[Cite as *State v. Wesson*, 2012-Ohio-4495.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

v.

HERSIE R. WESSON

    Appellant

C.A. No.    25874

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 2008-03-0710

DECISION AND JOURNAL ENTRY

Dated: September 28, 2012

MOORE, Judge.

{¶1} Appellant, Hersie Wesson, appeals the judgment of the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} Wesson was indicted in 2008 on 13 counts related to his murder of Emil Varhola, his attempted murder of Mary Varhola, and his robbery of their home. He waived his right to a jury trial and was tried by a three-judge panel. The panel granted Wesson's Crim.R. 29 motion as to one count of aggravated murder and also dismissed three counts of attempted aggravated murder. The panel found him guilty of two counts of aggravated murder and the capital specifications, attempted murder, aggravated robbery, having a weapon under disability, and tampering with evidence.

{¶3} At the conclusion of the mitigation phase of trial, the panel sentenced Wesson to death for the crime of aggravated murder. It further sentenced Wesson to various prison

sentences for the remaining offenses. Wesson appealed both his conviction and sentence to the Ohio Supreme Court. That appeal remains pending. *State v. Wesson*, Supreme Court No. 2009-0739.

{¶4} Wesson filed a petition for post-conviction relief in February 2010. The State moved to dismiss the petition and Wesson replied. Wesson moved for leave to conduct discovery and the State opposed his request. The trial court denied the motion to conduct discovery. The trial court denied and dismissed the petition for post-conviction relief. Wesson timely appealed raising three assignments of error for our review.

## II.

{¶5} Wesson has presented this Court with three assignments of error. In his first assignment of error, he argues that the trial court erred by dismissing his petition without holding a hearing and allowing discovery. In his second assignment of error, he argues more narrowly that the trial court should have permitted discovery before entering judgment. In this third assignment of error, he argues that cumulative errors warrant reversing the trial court's judgment and remanding for further postconviction relief proceedings. After reviewing the record, we conclude that the trial court did not err to Wesson's prejudice and affirm the trial court's judgment.

### Assignment of Error No. 1

The trial court erred by dismissing appellant's post-conviction petition, where he presented sufficient operative facts and supporting exhibits to merit at minimum an evidentiary hearing and discovery.

{¶6} Wesson argues that the trial court erred by denying his petition without holding an evidentiary hearing. This Court disagrees.

**Postconviction Relief Process**

{¶7}   R.C. 2953.21(A)(1)(a) permits a convicted criminal defendant to file a petition asking the trial court to vacate or set aside the judgment of conviction or sentence.  The petitioner must state all grounds for relief on which he relies, and he waives all other grounds not so stated.  R.C. 2953.21(A)(4).  The postconviction relief process is not itself a constitutional right.  *State v. Calhoun*, 86 Ohio St.3d 279, 281 (1999).  "Therefore, a petitioner receives no more rights than those granted by the statute."  *Id.*

{¶8}   In determining whether substantive grounds for relief exist, the trial court must consider, among other things, the petition, the supporting affidavits, and the documentary evidence filed in support of the petition.  R.C. 2953.21(C).  If the trial court finds no grounds for granting relief, it must make findings of fact and conclusions of law supporting its denial of relief.  R.C. 2953.21(G).

{¶9}   The petitioner "is not automatically entitled to a hearing on the petition."  *Calhoun* at 282.  The trial court serves a gatekeeping function in postconviction relief cases – it determines whether the petitioner will even receive a hearing.  *Gondor* at ¶ 51.  A trial court may dismiss a petition without a hearing "where the petition, the supporting affidavits, the documentary evidence, the files, and the records do not demonstrate that petitioner set forth sufficient operative facts to establish substantive grounds for relief."  *Calhoun* at paragraph two of the syllabus.  The gatekeeping function includes the trial "court's decision regarding the sufficiency of the facts set forth by the petitioner and the credibility of the affidavits submitted."  *Gondor* at ¶ 52.  On appeal, "a court reviewing the trial court's decision in regard to its gatekeeping function should apply an abuse-of-discretion standard."  *Id.*

{¶10} The Ohio Supreme Court concluded that "a trial court's decision granting or denying a postconviction petition filed pursuant to R.C. 2953.21 should be upheld absent an abuse of discretion; a reviewing court should not overrule the trial court's finding on a petition for postconviction relief that is supported by competent and credible evidence." *Id.* at ¶ 58. "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

## Wesson's Petition for Postconviction Relief

{¶11} Wesson presented eleven grounds for relief in his petition and added a twelfth ground in an amendment to the petition. The trial court denied the petition without a hearing. This Court must review the trial court's decision to determine whether its findings are supported by competent and credible evidence. *Gondor* at ¶ 52. If this Court concludes that the findings are properly supported, then this Court reviews the trial court's decision in regard to its gatekeeping function for an abuse of discretion. *Id.* Accordingly, we begin with a review of the trial court's factual findings.

## The Trial Court's Factual Findings

{¶12} The trial court made extensive factual findings when it denied Wesson's petition. In many respects, the factual findings mirror those the three-judge panel made when it sentenced him.

### *Emil and Mary Varhola*

{¶13} Emil and Mary Varhola, an elderly couple, lived in a home in Akron, Ohio, where they had lived for most of their marriage. They were vigilant in protecting themselves, going so

far as to install a phony video camera in the rear of the home to keep away potential intruders, using multiple locks, and keeping a handgun for protection.

{¶14} The couple suffered from numerous medical problems. Mr. Varhola had a pacemaker. An oxygen tube followed him around the house, allowing him to remain mobile despite his poor health. Mrs. Varhola had problems with her legs; she required a cane to walk.

*Wesson moved to the neighborhood*

{¶15} Wesson met Mr. Varhola around 2007 when Wesson moved in with his girlfriend who lived in the neighborhood. Wesson, then about 50 years old, chatted regularly with Mr. Varhola, sometimes asking for money to help his children. One cold December day, Wesson knocked on the door. Mr. Varhola answered the door, pistol in hand. When he saw that it was Wesson, he put the gun in his pocket and allowed him to enter his home.

{¶16} By late February 2008, Wesson was no longer living with his girlfriend in the Varholas' neighborhood. Because of "incidents" between them, Wesson's girlfriend had contacted his parole officer.

*The day of the murder and attempted murder*

{¶17} On February 25, 2008, Wesson arrived by bus in the Varholas' neighborhood. He went directly to the back door of the Varholas' home. Mr. Varhola welcomed him into his home. Mr. Varhola sat in the kitchen with Wesson while Mrs. Varhola sat in the living room. Wesson was offered food as he talked with Mr. Varhola. The Varholas did not know that Wesson was waiting for his former girlfriend to return home because he planned to kill her.

{¶18} After a while, Mrs. Varhola, who still sat in the living room, heard a whistling noise coming from the kitchen. After struggling to get up from her chair, she shuffled to the kitchen, cane in hand, where she saw her husband's lifeless body on the floor, still bleeding from

multiple stab wounds. The whistling sound came from Mr. Varhola's severed windpipe, oxygen still flowing through the hose he wore. As she absorbed this scene, she saw Wesson going through Mr. Varhola's pockets. Mrs. Varhola cried out that Wesson had killed her husband. Wesson grinned at her and said that he had killed him.

{¶19} Wesson then came after Mrs. Varhola with a knife. He demanded to know where he could find the gun. He presumably meant Mr. Varhola's handgun which, unbeknownst to Wesson, was safely hidden inside a hollowed-out book on a living room bookshelf. There were other guns in the house, however, including several long guns kept in a gun cabinet.

{¶20} Mrs. Varhola struggled against Wesson. She even used her cane to fight off his attack. Wesson quickly overwhelmed her by punching, kicking, and stabbing her. She finally pretended to be dead in hopes that he would stop. Wesson ended his assault, spent several minutes looking about the house, and left. Mrs. Varhola made her way to a phone to call her son for help.

*The aftermath*

{¶21} Wesson killed Mr. Varhola and severely injured Mrs. Varhola. The medical examiner conducted an autopsy concluding that Mr. Varhola was stabbed deeply with a knife multiple times. He suffered wounds in his neck, chest, and back. The stab wounds in his back were made after Mr. Varhola's heart had stopped beating.

{¶22} One of Mrs. Varhola's teacups was found under a bush outside the house. Along with the teacup, police found one of Mr. Varhola's long guns. Wesson's DNA was found on both of these items. Mr. Varhola's empty wallet was found weeks later several blocks away.

{¶23} Wesson was tried by a three-judge panel. The panel found him guilty of the offenses, as noted above. After a sentencing hearing, the panel ordered that Wesson be sentenced to death.

{¶24} We have thoroughly reviewed the record. The trial court's findings, as detailed above, are supported by competent and credible evidence. We now turn to review the trial court's decision on each of Wesson's grounds for relief to determine whether the trial court abused its discretion in exercising its gatekeeping function by dismissing the petition without a hearing. If the petition, supporting affidavits, documentary evidence, files, and records do not demonstrate sufficient operative facts to establish substantive grounds for relief, then the trial court properly exercised its discretion in dismissing the petition without a hearing. *Gondor*, 2006-Ohio-6679, at ¶ 52.

### Wesson's Grounds for Relief

{¶25} Wesson presented eleven substantive grounds for relief and one cumulative error ground for relief. Many of the claims are related, so we will discuss them in groups.

### *Claims Barred by Res Judicata*

{¶26} Wesson presented three grounds for relief – eight, nine, and ten – that are barred by res judicata. "Res judicata bars the assertion of claims against a valid, final judgment of conviction that have been raised or could have been raised on appeal." *State v. Ketterer*, 126 Ohio St.3d 448, 2010-Ohio-3831, at ¶ 59, citing *State v. Perry*, 10 Ohio St.2d 175 (1967), paragraph nine of the syllabus. The claims raised in these three grounds for relief have been raised, or could have been raised, in Wesson's direct appeal.

{¶27} Wesson's ninth ground for relief claimed error in the formation of the three-judge panel that tried him. His tenth ground for relief claimed that he was denied effective assistance

of counsel because his attorneys did not object to those errors in the formation of the three-judge panel. Both of these alleged errors appear on the face of the record – the parties discussed the formation of the three-judge panel at length.

{¶28} Res judicata bars consideration of these issues even though the direct appeal remains pending. *Perry* at 182.

> Whether the appeal is sustained or not, it will adjudicate the merits of the claims raised in these postconviction proceedings. Our statutes do not contemplate relitigation of those claims in postconviction proceedings where there are no allegations to show that they could not have been fully adjudicated by the judgment of conviction and an appeal therefrom.

*Id.* The alleged error could be, and was, raised on direct appeal. Wesson's direct appeal as of right is pending before the Ohio Supreme Court. *State v. Wesson*, Supreme Court No. 2009-0739. In that appeal, his fourth proposition of law argues that the trial court erred in its method for empaneling the three-judge panel. In his eighth proposition of law, he argues that trial counsel was ineffective for failing to object to this method.

{¶29} The alleged errors in these grounds for relief could be fully adjudicated on direct appeal. Accordingly, res judicata barred their consideration in postconviction relief.

{¶30} Wesson's eighth ground for relief claimed that trial counsel did not do enough to impeach Mrs. Varhola during the guilt phase. This alleged error also appears on the face of the record. All of the arguments contained in this claim focus on comparing Mrs. Varhola's testimony with the testimony of other witnesses. The alleged error could have been raised on direct appeal. For example, Wesson's brief in the Supreme Court points out that Mrs. Varhola was confused about several details, including the time and date of the attack and what happened during the crime. Merit Brief of Hersie Wesson, Supreme Court Case No. 2009-0739, at 4. Wesson made these precise arguments in his petition for postconviction relief. Counsels' alleged

failure to impeach Mrs. Varhola appeared on the record and, accordingly, is barred by res judicata.

**{¶31}** The trial court addressed these grounds for relief on the merits and concluded that Wesson was not entitled to relief. Because the alleged errors appeared on the record, they were barred by res judicata, and the trial court should have disposed of them on that basis. Nevertheless, this Court will not reverse a correct judgment merely because of a flaw in the trial court's analysis. *See, e.g., Rude v. NUCO Edn. Corp.*, 9th Dist. No. 25549, 2011-Ohio-6789, ¶ 21. This "court shall affirm a trial court's judgment that is legally correct on other grounds, that is, one that achieves the right result for the wrong reason, because such an error is not prejudicial." *Id.*, quoting *Cook Family Invests. v. Billings*, 9th Dist. Nos. 05CA008689, 05CA008691, 2006–Ohio–764, at ¶ 19.

**{¶32}** Wesson's assignment of error as it relates to grounds eight, nine, and ten, is overruled.

*Ineffective Assistance of Counsel*

**{¶33}** The remainder of Wesson's claims, except for the cumulative error ground for relief, allege that Wesson was denied the effective assistance of counsel. Although we often review claims of ineffective assistance of counsel in criminal cases, the issues raised in capital cases are often more involved than in non-capital criminal cases. Before discussing Wesson's specific claims, we first examine a number of decisions outlining the right to effective assistance of counsel, focusing on claims raised in mitigation hearings in capital cases.

**{¶34}** It is beyond question that the Sixth Amendment guarantees the right to counsel. *See, e.g., Gideon v. Wainwright*, 372 U.S. 335 (1963). This right is necessary to protect the fundamental right to a fair trial. *Strickland v. Washington*, 466 U.S. 668, 684 (1984). "[A] fair

trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding." *Id.* at 685. The counsel guaranteed by the Sixth Amendment plays "a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair." *Id.*

{¶35} In *Strickland*, the United States Supreme Court examined the meaning of a claim of actual ineffective assistance of counsel. *Id.* at 686. The Court remained mindful of the purpose of counsel – to ensure a fair trial – as the guide. *Id.* "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id. Accord State v. Hester*, 45 Ohio St.2d 71 (1976) (the test is whether the defendant, under all the circumstances, had a fair trial and substantial justice was done). The defendant must show more than that alleged errors "had some conceivable effect on the outcome of the proceeding [because] [v]irtually every act or omission of counsel would meet that test * * *." *Id.* at 693. "[N]ot every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.*

{¶36} The focus is different when a defendant challenges his death sentence. The question for the reviewing court is whether there is a reasonable probability that, absent counsel's errors, the sentencer "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695.

{¶37} *Strickland*, like this case, involved a capital sentencing proceeding. In that context, the Supreme Court established the now familiar test for ineffective assistance of counsel:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687. The Supreme Court emphasized that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. The Court recognized that "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* *See, e.g., Morton v. Secretary, Florida Dept. of Corrections*, 684 F.3d 1157, 1157 (11th Cir.2012) ("This appeal illustrates the truism that, regardless of the mitigation strategy that capital defense lawyers choose, they are often 'damned if they do, and damned if they don't' when their clients later assert claims of ineffective assistance of counsel during collateral review."). *Strickland* cautioned that a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland* at 689. Along the same lines, the Ohio Supreme Court has repeatedly held that in Ohio, a properly licensed attorney is presumed competent. *See, e.g.*, *Vaughn v. Maxwell*, 2 Ohio St.2d 299, 301 (1965).

{¶38} When a defendant asserts that he was denied the effective assistance of counsel, the defendant has the burden to identify counsel's acts or omissions that were not the result of

reasonable professional judgment. *Strickland* at 690. The reviewing court must then decide whether, considering all of the circumstances, the asserted acts or omissions "were outside the wide range of professionally competent assistance." *Id.* The court must remain mindful of two things: counsel's function was to make the adversarial testing process work in that particular case and, at the same time, "counsel [was] strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

{¶39} *Strickland's* discussion of counsel's duty to investigate is particularly relevant here. There are two different paths the analysis can follow. First, when counsel conducts a thorough investigation of law and facts relevant to plausible options, counsel's strategic choices are "virtually unchallengeable." *Id.* at 690. Second, when counsel makes less than a complete investigation, counsel's strategic choices are reasonable to the extent that reasonable professional judgments support the limitations on the investigation. *Id.* at 690-91. Thus, counsel's duty to his client can be discharged in one of two ways: (1) "counsel has a duty to make reasonable investigations," or (2) "counsel has a duty to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691.

{¶40} When a defendant claims he was denied effective assistance of counsel, counsels' "decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* The principal concern in deciding whether counsel exercised reasonable professional judgment is not whether they should have presented the evidence they did for mitigation, but rather whether counsels' investigation supporting their decision was itself reasonable. *Wiggins v. Smith*, 539 U.S. 510, 511 (2003). A cursory investigation may justify a tactical decision to limit the scope of counsels' investigation,

but a reviewing court must consider the reasonableness of the investigation asserted to support that strategy. *Id.* at 527. The presentation of evidence at a mitigation hearing is a matter of trial strategy. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, ¶ 225. Neither *Strickland* nor *Wiggins* requires "counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins* at 533.

**{¶41}** With this background, we consider Wesson's grounds for relief.

Grounds for Relief One, Two, and Three –
Ineffective Assistance of Counsel – Failure to Investigate

**{¶42}** In his first three grounds for relief, Wesson argued that he was denied the effective assistance of counsel because of counsels' failure to investigate, prepare, and present evidence of his ability to adapt to prison. He relies on *Skipper v. South Carolina*, 476 U.S. 1 (1986), to support his argument.

**{¶43}** Ronald Skipper was held for more than seven months while waiting for his murder trial. *Id.* at 4. At his capital sentencing hearing, he sought to introduce evidence of his good behavior in jail during the time he waited for trial. *Id.* The trial court denied his request to call three witnesses to testify about his jail behavior during his pretrial detention. *Id.* at 3. The prosecutor, however, in closing argument, told the jury of the dangers Skipper would pose if sentenced to prison; he even argued that Skipper could be expected to rape other inmates. *Id.* at 3. The jury sentenced Skipper to death. *Id.* The United States Supreme Court held that under these circumstances, it appeared reasonably likely that the exclusion of evidence of good behavior in jail while awaiting trial may have affected the jury's sentencing decision. *Id.* at 8.

**{¶44}** The Supreme Court described this type of evidence as "potentially mitigating." *Id.* at 5. In a footnote, the Court recognized that the relevance of this evidence may hinge on the State's case. *Id.* at n. 1. For example, the prosecutor argued that Skipper could not be trusted if

he were sentenced to prison. *Id.* at 5. Where the state "relies on a prediction of future dangerousness" in seeking the death penalty, the defendant must be given an opportunity to present evidence in response. *Id.* at n. 1.

{¶45} In this case, the State did not argue that Wesson would be dangerous if he were incarcerated and the trial court did not exclude any relevant evidence. In fact, Wesson was able to introduce evidence of his past adjustment to prison through the testimony of Dr. Smalldon, a forensic psychologist who testified extensively in mitigation.

{¶46} In his petition, Wesson argued that his conduct during his previous 20 years of incarceration demonstrated that he would not be a threat to anybody in prison and, therefore, he would be a good candidate for a sentence for life without parole instead of death. When considering Wesson's sentence, the trial court noted that it gave a small amount of weight to Wesson's cooperative conduct in jail and the absence of bad conduct in prison.

{¶47} Wesson's first and second grounds for relief were that trial counsel failed to investigate and present evidence about his adaptability to prison and his positive contributions to prison life. Wesson focused on three main points in support of these grounds for relief to argue that trial counsel could have done more.

{¶48} Wesson presented hundreds of pages of his prison records in support of these grounds for relief. These records show that Wesson spent many years of his adult life in prison. They also demonstrate that he had his share of problems while incarcerated.

{¶49} Wesson has used these records, and the report of a postconviction expert witness, Dr. Clemons Bartollas, to argue that his prison record shows that he adapted well to incarceration. That conclusion is debatable, however. Dr. Bartollas concluded that "in the structured environment of a prison [Wesson] does very well." Dr. Bartollas minimized the

number of problems Wesson had while he was in prison, concluding that he "is not a threat to anyone in prison * * *."

{¶50} Wesson's prison conduct problems included a number of disciplinary infractions for failing to report to work or not obeying an order. He also referred to a corrections officer by an offensive name. His infractions were not limited to verbal or conduct offenses. Wesson also had several violent confrontations with other inmates. Early in his tenure in prison, Wesson stabbed an inmate with a pair of scissors. He was involved in other fights over the course of the 20 years he spent as an inmate. Dr. Bartollas accepted Wesson's belief that these fights arose "out of the on-going tensions of prison life." For example, one of the fights started after an inmate made fun of Wesson's stutter.

{¶51} Missing from Dr. Bartollas' report is any explanation of how the tensions of prison life would change for Wesson if he were to serve a life sentence. Wesson would still have the same pressures that caused other fights. His stutter would continue to be a source of frustration for him, and there is no dispute that it was, at least in part, the cause of one fight. Dr. Bartollas specifically noted that "Wesson is small and stutters, and that this would make his survival in prison populations difficult."

{¶52} Wesson also argued that trial counsel failed to show that he was a positive force in the prison during the 20 years he was incarcerated. Based on an interview with another inmate, Corbitt Norman, Dr. Bartollas concluded that Wesson had been a positive force in the prison and had helped other inmates. Mr. Norman was Wesson's son-in-law.

{¶53} Norman said that Wesson was a positive force in his life in prison – Wesson encouraged him to get an education and learn a trade. He also said that Wesson helped other inmates and was a peacemaker in the prison. Norman "never saw Wesson in a fight because he

could talk his way out of anything." On the other hand, Norman also said that he saw Wesson intoxicated from "hooch," an alcoholic drink made in the prison.

**{¶54}** Finally, Dr. Bartollas noted that the prison records demonstrated that Wesson received good work performance evaluations. He specifically pointed to two evaluations that scored him high on a ten-point scale and noted that he "completes his duties with a good attitude." In another portion of his report, however, Dr. Bartollas noted that some of Wesson's disciplinary infractions were for failing to report to work. Another evaluation, not mentioned by Dr. Bartollas, scored Wesson at "5" instead of the higher scores noted on other evaluations.

**{¶55}** There is other information contained in the hundreds of pages of prison records that counsel could have decided they did not want to bring to the trial court's attention. For example, an Adult Parole Authority report from 1999 includes information about his child endangering conviction. Along with facts about the offense, the report stated that Wesson failed a polygraph test because his responses were deceptive to questions about whether he dropped a baby to the ground and struck the baby in the head. That report included nine pages of prior convictions. Another presentence report from a different case noted that Wesson's "prior adjustment to supervision has been poor."

**{¶56}** As we evaluate the evidence Wesson presented in support of these Grounds for Relief, it is also important to consider Dr. Bartollas' report. The report is five pages long; the first page is in an introduction, citing several of Dr. Bartollas' own publications about prison violence, and the last page contains only the endnotes for the report. The remaining three pages of the report offer a sketch of Wesson's life in prison. By comparison, Dr. Bartollas' vita is 13 pages long. The vita details his extensive and impressive publication record, but it also reveals

that the bulk of his work involves juvenile offenders. Wesson, on the other hand, is in his 50s, and would confront a far different prison landscape than a juvenile offender.

{¶57} With respect to his first and second grounds for relief, Wesson has argued that he was denied the effective assistance of counsel because "there is no indication that trial counsel had a strategic reason for not utilizing Wesson's prison records." But Wesson has not presented any evidence that counsel did not consider and use his prison records. In fact, Dr. Smalldon testified that he "reviewed an extensive collection of records from the Ohio Department of Rehabilitation and Corrections." The trial court noted that it gave some weight in mitigation to Wesson's lack of bad conduct in prison, even though it also recognized that his previous incarcerations included fighting and refusing orders. The trial court apparently did not hold Wesson's bad conduct against him, and actually gave him some credit in mitigation. Although Wesson acknowledged he "was not perfect in prison," he faults his counsel for not offering his prison records, and the testimony of an expert like Dr. Bartollas, to explain that Wesson could exist peacefully in prison with a life sentence.

{¶58} Dr. Bartollas' report, however, can be read to suggest that the same things that caused Wesson to have problems in prison – his size and stuttering – would continue to cause problems in future incarceration. Far from demonstrating ineffective assistance of counsel, the record and evidence Wesson presented with his petition shows that trial counsel managed to present positive mitigation evidence based on Wesson's prior incarceration even though the trial court recognized that Wesson had problems as a prisoner, including some that may have been more serious than the trial court realized. By not focusing on the prison records, trial counsel also did not bring attention to other damaging information that the trial court may have otherwise reviewed.

{¶59} Wesson has not demonstrated that he was denied the effective assistance of counsel as it relates to the first and second grounds for relief and, accordingly, the trial court did not err in denying relief without a hearing.

{¶60} Along the same lines, Wesson's third ground for relief specifically challenged trial counsel's failure to call Norman, mentioned above, to testify at the mitigation hearing. Wesson argues that Norman could have testified about Wesson's adaptability to prison.

{¶61} The facts in Norman's affidavit would not have added substantially to the evidence presented to the trial court. It appears that Wesson sought out Norman because Norman was his son-in-law. As noted above, Wesson encouraged him to get an education. Norman also swore he never saw Wesson in a fight because he "could talk his way out of anything." This assertion is countered by the undisputed evidence that Wesson was involved in fights in prison and, because of the stuttering that embarrassed him, it appears contradictory that he could talk his way out of anything. Norman's affidavit also contains damaging evidence that Wesson was drunk while in prison after drinking hooch, a fact the sentencing panel apparently did not have before it.

{¶62} Norman's affidavit offers some positive, and some negative, evidence about Wesson's adaptability to prison. The key point, however, is that the trial court found some evidence in mitigation because of Wesson's conduct in prison. There is nothing in Norman's affidavit that would have tilted the scale any further in Wesson's favor. Wesson has not demonstrated that he was denied the effective assistance of counsel as it relates to the third ground for relief.

{¶63} Wesson has not demonstrated that he was denied the effective assistance of counsel as alleged in his first three grounds for relief. Accordingly, the trial court did not abuse its discretion in dismissing the petition without a hearing.

Grounds for Relief Five, Six, Seven, and Twelve –
Failure to Introduce Evidence and Call Witnesses

{¶64} In these four grounds for relief, Wesson complained that trial counsel were ineffective for failing to present evidence of Wayne Wesson's criminal records and to call three witnesses: his cousin Herb Wesson, his past-employer Edgar Lee, and his cousin Deborah Wells. According to Wesson, trial counsel should have presented this evidence to show a clearer picture of his background.

{¶65} To put this argument in context, it is important to first review the evidence that trial counsel presented through Wesson's sister, Yvette Wesson. Ms. Wesson was born two years before Wesson. She was born in Cleveland Ohio, Wesson was born two years later in Detroit, Michigan, and their younger brother, Wayne Wesson, was born in Cleveland three years after that. Their parents, Barbara Wesson and Hersie Wesson, Sr., moved from Cleveland to Detroit, and back to Cleveland, because of job changes. During these years, Mr. and Mrs. Wesson drank excessive amounts of alcohol, including when Mrs. Wesson was pregnant with the children. Ms. Wesson believed that both of her parents were alcoholics.

{¶66} Ms. Wesson told several tragic stories about their childhood. For example, while living in Detroit, just a few months after Wesson was born, Mrs. Wesson and her mother, who was visiting from Cleveland, wanted to go out to a club. Ms. Wesson was taking care of Wesson during this time because of the alcoholism in the family. Ms. Wesson's grandmother said they did not need to get a babysitter and, instead, she poured gin in Wesson's bottle and gave it to him to drink. She also gave Ms. Wesson a bottle of beer to drink. Ms. Wesson's mother and

grandmother then gave the children pillows and blankets, locked them in a closet, and left for the clubs. Ms. Wesson and Wesson sat in the closet while he cried. Wesson eventually drank the bottle and she feared that he had died.

{¶67} When Wesson was about a year old, he suffered a serious injury. A relative, who was drunk at the time, was carrying him while walking up stairs. She slipped and they both fell all the way to the bottom of the stairs. Ms. Wesson, who was also knocked down, recalled that Wesson was unconscious and his head was cracked open and bloody. He was not taken to the hospital.

{¶68} When the family returned to Cleveland, Mr. Wesson was bedridden because of a back injury. Mrs. Wesson worked two jobs and was rarely home to supervise the children. And both parents continued to drink alcohol during this time, perhaps even more than before.

{¶69} Mr. Wesson was an abusive father, especially when he was drunk, which was most of the time. He would beat the kids if they came home late from school or if he did not approve of their appearance. He would hit them "with razor straps, slats from underneath the bed to hold the mattress up, electric cords, belts, switches with knots tied in them. I guess whatever was available."

{¶70} One of the things that particularly upset Mr. Wesson was Wesson's stutter. Mr. Wesson would tell Wesson that he was not his child and beat him. Mr. Wesson's beatings would happen at least once a day. After some time, the family's home caught fire and was completely destroyed. The family moved in with Mr. Wesson's mother in Cleveland. After several months, Wesson moved to live with a cousin and Ms. Wesson moved to live with a different cousin. Later, Mr. Wesson moved to Tennessee, Mrs. Wesson began living with a man named Mr. Marino, and the kids moved back to live with their mother.

{¶71} Mr. Marino also drank, although not as much, and was violent. Mrs. Wesson and Mr. Marino argued in front of the children. In one incident, Mr. Marino threw Mrs. Wesson in a bathtub, beat her, and threw glasses at her. Wesson and Ms. Wesson tried to fight him off. The violence continued for some time and Mrs. Wesson suffered numerous injuries, including several miscarriages, as a result of the beatings.

{¶72} As Ms. Wesson grew older, she also grew more defiant. She finally put her foot down and told her father to stop beating her brothers. Mr. Wesson focused his beating on her instead, but still continued to hit Wesson.

{¶73} Eventually the family moved to Akron to live with Mrs. Wesson's mother, Mrs. Williams. Mrs. Williams ran a restaurant. She was also an alcoholic and physically abusive toward Wesson. Mrs. Williams' brother, Eugene, intervened and protected the kids from the abuse. Ms. Wesson moved to Cleveland when she was about 14 years old. Wesson and his brother remained in Akron and, thanks to Eugene, the situation got better for them.

{¶74} Wesson had his share of other injuries, starting with the fall down the steps when he was about a year old. When he was about 15 years old, he was robbed. He was badly injured – he was beaten and cut in several places, including the back of his head. He also had an argument with his younger brother that escalated until Wayne Wesson hit Wesson over the head with a large glass bowl that Ms. Wesson guessed weighed about 40 pounds.

{¶75} When Ms. Wesson was about 18, she moved to California. She fought to have Wesson move to California and, when he was about 18, he also moved to live with her. Within a day, however, Wesson was homesick and he returned to Ohio to live with his mother.

{¶76} Ms. Wesson provided this detailed testimony about the formative years she spent with her brothers. The trial court found her to be credible, and, as noted above, the trial court's

findings of fact were supported by competent and credible evidence. Her testimony painted a picture of a young life filled with alcohol, violence, poverty, and chaos. "Chaos" was also a word Dr. Smalldon used to describe Wesson's life.

**{¶77}** With that background, we now consider the other evidence and witnesses Wesson now claims should have been presented at his mitigation hearing.

<u>Wayne Wesson's Criminal Record</u>

**{¶78}** Wayne Wesson is Wesson's younger brother. Wesson, his sister, and brother, lived through the same difficult conditions as children. Ms. Wesson has no criminal record, as noted by the State during the trial. Wesson, as outlined above, has an extensive criminal record. He has argued that evidence of his brother's criminal record should have been introduced to show that, unlike his sister, his brother does have a criminal record. According to Wesson, this would have weakened the State's argument that Ms. Wesson lived through the same events as Wesson but she does not have a criminal record.

**{¶79}** At the trial, the State pointed out that many people grew up in abusive homes. It pointed to Ms. Wesson as an example of someone who lived through that experience without turning to a life of crime. Wesson argued in his petition that trial counsel were ineffective for failing to present his brother's criminal record to counter his sister's lack of a criminal record. Among the many exhibits he filed with his petition, he did not include an affidavit from his brother. The petition relied on print-outs of numerous on-line criminal dockets showing that Wesson's brother had a lengthy criminal record. The trial court concluded that evidence of Wayne Wesson's criminal record would not have made a difference in its decision because both of Wesson's siblings lived through similar abusive childhoods, but only Wesson had killed someone. Although Wesson criticizes this reasoning, the trial court was correct. *See Wong v.*

*Belmontes*, 558 U.S. 15, 130 S.Ct. 383, 386 (in evaluating defendant's claim, it is necessary to consider all of the relevant evidence the trial court would have had before it if trial counsel had sought to introduce it.). The records would have highlighted that three people lived through similar abusive childhoods and that only Wesson killed someone.

**{¶80}** The petition for postconviction relief did not include an affidavit from Wayne Wesson to explain anything about his past or his criminal record. There was nothing to certify the on-line printouts as accurate representations of his criminal record or to demonstrate that the defendant was in fact Wesson's brother. It is mere speculation to claim that introducing these records would have had any impact on the trial court. *See, e.g., State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, ¶ 121.

**{¶81}** Wesson has not demonstrated that he was denied the effective assistance of counsel as it relates to his fifth ground for relief.

<u>Herb Wesson's Testimony</u>

**{¶82}** Wesson argued that trial counsel were ineffective for failing to call Herb Wesson to testify at his trial. Herb Wesson was a cousin of the Wesson siblings. The trial court concluded that the cousin's testimony would not have added anything to the testimony of Wesson's sister.

**{¶83}** Wesson asserted that "[a] failure to provide a sentencer with additional mitigation is not a reasonable strategic decision." This position is contrary to the Supreme Court's conclusion that trial "counsel's decision not to call additional family members as mitigation witnesses was a 'tactical choice' and did not result in ineffective assistance of counsel." *Hand*, 2006-Ohio-18, at ¶ 241; *see, also, Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, at ¶ 116. The United States Supreme Court has also rejected the "'more-evidence-is-better' approach" where

offering additional evidence could have resulted in the sentencer hearing other evidence that trial counsel, for tactical reasons, did not want the jury to hear. *Wong* at 389.

**{¶84}** As for the cousin's testimony, Wesson argued that, "[a]s someone outside the family, Herb Wesson would have provided the panel with a different perspective of Wesson's upbringing." Specifically, the cousin could have testified that Wesson lived in a chaotic home where he learned bad behaviors. According to Wesson, this would have shown that the harmful home environment was apparent even to an outsider.

**{¶85}** The cousin's testimony, recounting observations from a distance, would not have been superior to the testimony given by Ms. Wesson and the history recounted by Dr. Smalldon. The trial court found Ms. Wesson to be a credible witness. She testified to a horrible home life based on her personal experiences. Trial counsel were not ineffective for not buttressing this testimony with evidence from a cousin who had some recollections of Wesson's bad home life. *See Hand* at ¶ 241. This evidence "would barely have altered the sentencing profile presented to the sentencing judge[s]." *Strickland*, 466 U.S. at 700. Accordingly, Wesson has not demonstrated that he was denied the effective assistance of counsel as it relates to his sixth ground for relief.

Edgar Lee's Testimony

**{¶86}** Wesson argued that trial counsel were ineffective for failing to present the testimony of Edgar Lee. Mr. Lee hired Wesson to do odd-jobs for him. According to Mr. Lee's affidavit, Wesson worked for him for a few months in 2007. Mr. Lee found Wesson to be a good, reliable worker.

**{¶87}** Wesson asserted that Mr. Lee's testimony was significant. According to Wesson, Mr. Lee's testimony about Wesson's part-time work for him over a few months would have been

substantial enough to allow the trial court to create a positive image of Wesson as an adult. But the trial court heard this evidence through Dr. Smalldon. He testified that Wesson "had lost the job that he had for a number of months in 2007, which for him was a significant source of self-worth." Dr. Smalldon also told the trial court that Wesson was frustrated when he lost the ability to contribute to paying bills.

{¶88} The trial court concluded that it was reasonable to assume that trial counsel did not consider a temporary, part-time, employer's testimony to be relevant or compelling. Counsels' decision whether to call a witness "falls within the rubric of trial strategy * * *." *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, ¶ 222. Wesson's attorneys were "entitled to be selective" when deciding which witnesses to call and, again, this evidence would not have altered the sentencing profile. *Id.* After reviewing the evidence, and Wesson's argument, we agree with the trial court's conclusion. Wesson has not demonstrated that he was denied the effective assistance of counsel as it relates to his seventh ground for relief.

Deborah Wells' testimony

{¶89} Wesson argued that trial counsel should have called Deborah Wells to testify. Ms. Wells is Wesson's cousin. Like Herb Wesson, discussed above, Ms. Wells' testimony would not have added anything to the testimony of Wesson's sister. Postconviction counsel have characterized Ms. Wesson's testimony as lacking credibility and self-serving. Regardless of how postconviction counsel viewed her testimony, the trial court found her to be credible. Ms. Wells' testimony would have been less detailed, but otherwise cumulative, to Ms. Wesson's testimony. Trial counsel could have reasonably decided to focus on Ms. Wesson's testimony that described a life shattered by alcohol, physical, and mental abuse, rather than diluting Wesson's history with

the testimony of a cousin with whom Wesson sometimes stayed, but who did not have constant contact or interaction with him. *See, e.g., Were* at 222.

{¶90} We conclude here, as we did with Wesson's other cousin, that trial counsel were not ineffective because they did not present her testimony in mitigation. Accordingly, Wesson has not demonstrated that he was denied the effective assistance of counsel as it relates to his twelfth ground for relief.

{¶91} Wesson has not demonstrated that he was denied the effective assistance of counsel as alleged in his fifth, sixth, seventh, and twelfth grounds for relief. Accordingly, the trial court did not abuse its discretion in dismissing the petition without a hearing.

Ground for Relief Four – Dr. Smalldon's testimony

{¶92} Wesson argued that trial counsel were ineffective because they did not "ensure that the mitigation expert presented a complete picture of Wesson's mental and emotional problems and development." He further contended that Dr. Smalldon "failed to establish a nexus between Wesson's various mental health issues and the crime." He criticized Dr. Smalldon's testimony because Dr. Smalldon "damaged his credibility with the sentencing panel when he downplayed Wesson's diagnosis of Antisocial Personality Disorder." Wesson tied these problems to his counsel by arguing that they were ineffective because they did not adequately research and screen their expert. Wesson complained that his counsel could not "merely hire a mitigation expert and then hope that the expert performs adequately." After our review of the record, we conclude that Wesson failed to present any evidence to show that his trial counsel were ineffective.

{¶93} Dr. Smalldon testified at length at the mitigation hearing. His testimony covered almost 100 pages of the transcript. He testified that he began his consultation on this case in

April 2008, almost a year before he testified. He met with Wesson three times for a total of about 15 hours. He also worked in conjunction with a mitigation specialist hired by trial counsel. The mitigation specialist gathered background information about Wesson and shared it with Dr. Smalldon.

{¶94} Dr. Smalldon recounted all of the documents he reviewed, including Wesson's extensive collection of records from the Ohio Department of Rehabilitation and Corrections, the facility where Wesson was held when he was a juvenile, the Akron City Schools, the Adult Parole Authority, and the mental health agency where he was a client before he murdered Mr. Varhola. He and the mitigation specialist also met with trial counsel and interviewed witnesses over the months he spent preparing for trial and a possible mitigation hearing.

{¶95} Wesson's argument focused on one narrow criticism: that trial counsel did not adequately prepare Dr. Smalldon to testify about Wesson's antisocial personality disorder. He ignored the remainder of Dr. Smalldon's testimony. For example, Dr. Smalldon testified about Wesson's positive interactions with the deputies in the jail during his visits. He testified at length about Wesson's prenatal exposure to alcohol and how that affected Wesson's development. He explained the difference between fetal alcohol syndrome and fetal alcohol effect and highlighted the deficits that stem from fetal alcohol effect, including an inability to assess consequences of behavior and inability to respond appropriately to subtle social and personal cues. He noted three other findings for people suffering from fetal alcohol effect – stuttering, impulsivity, and low frustration tolerance. Dr. Smalldon said that all of these things were consistent with what he learned about Wesson.

{¶96} Dr. Smalldon testified about Wesson's life as a child and young adult. He focused on the physical abuse Wesson observed and suffered. Dr. Smalldon said that children

like Wesson, who have witnessed violence between significant people in their lives, are at a greater risk for engaging in violent behavior as adults.

{¶97} Dr. Smalldon also explained what he learned about Wesson's numerous head injuries. He described four different head injuries that resulted in Wesson losing consciousness. He explained that these are significant events because head injuries frequently result in behavioral problems, including impulsivity, poor self-regulation, and poor judgment. Dr. Smalldon was not able to precisely determine the extent of the injuries Wesson suffered because Wesson refused to participate in full neuropsychological testing.

{¶98} Dr. Smalldon did administer a number of psychological tests. The results showed that he was functioning on an elementary school level and that he had a low IQ. Although Dr. Smalldon was not able to conduct a complete battery of neuropsychological tests, the results from the tests he administered were consistent with someone who suffered from a brain injury.

{¶99} Dr. Smalldon reviewed more of Wesson's life history, including his alcohol problems and his difficult relationships with many different women. He told the trial court that Wesson's brief employment in 2007, the job Edgar Lee would have testified about, was a source of self-worth to Wesson.

{¶100} Based on all of the information Dr. Smalldon collected, he presented the trial court with a diagnosis. Dr. Smalldon testified to Wesson's multi-part diagnosis, which included (1) depressive disorder, not otherwise specified, (2) borderline intellectual functioning, (3) alcohol dependence, and (4) a personality disorder not otherwise specified with passive aggressive, narcissistic, and anti-social features. Dr. Smalldon explained each of these in some detail, including the personality disorder that is the basis of this ground for relief.

{¶101} Wesson complained that Dr. Smalldon damaged his own credibility, and counsel failed to adequately prepare him, when Dr. Smalldon testified that "anti-social, it just refers to a long pattern of rule-breaking behavior." There is no question that Dr. Smalldon made that statement, but it came at the end of six pages of discussion about Wesson's anti-social personality disorder, which he characterized as having "passive-aggressive, narcissistic, and anti-social features." At the beginning of his testimony, Dr. Smalldon said that a personality disorder "refers to a very deep-seated enduring pattern of behavior that has resulted in either a very significant subjective distress or caused the individual major problems across the different dimensions of their life, relational, vocational, so on." He continued that "it refers to a very deeply-rooted personality dysfunction by definition [with] roots that go back into the person's developmental history."

{¶102} Wesson presented a report by Dr. Dennis M. Eshbaugh in support of this ground for relief. Dr. Eshbaugh's Mitigation Review report set out an overview of what happened at trial, what Dr. Eshbaugh learned from a three-hour meeting with Wesson after he was sentenced, and an evaluation of Dr. Smalldon's performance at the mitigation hearing. Dr. Eshbaugh complimented Dr. Smalldon's professional experience and concluded that it was clear Dr. Smalldon "was very familiar with Mr. Wesson's history and mental status. He was adept in highlighting the difficulties Mr. Wesson has had throughout his life."

{¶103} Dr. Eshbaugh wrote in his report that he believed Wesson's history clearly indicated antisocial personality disorder and that it should have been presented directly. He also thought that Dr. Smalldon focused too much on Wesson's brain injuries without sufficient evidence to prove that he had ever actually suffered an injury. Dr. Eshbaugh spent several pages

in his report explaining why he thought it would have been important to focus more on the anti-social personality diagnosis. He did not disagree with Dr. Smalldon's other diagnoses.

{¶104} Dr. Eshbaugh concluded that Wesson made a choice in causing the death of Mr. Varhola and assaulting Mrs. Varhola, but he did not have a choice in the circumstances that led to his behavior in the offenses. According to Dr. Eshbaugh, Wesson's antisocial personality disorder, alcoholism, violence, and limited intellectual capacity were dictated by his family, both genetically and environmentally. His stressors at the time he committed the murder were beyond his ability to manage. At the mitigation hearing, Dr. Smalldon reached a similar conclusion. He concluded that Wesson could not act appropriately because of his impulsivity, inability to think about consequences, personality-related factors, limited intellectual ability, and alcoholism.

{¶105} Dr. Smalldon and Dr. Eshbaugh reached the same conclusions. Dr. Eshbaugh agreed with Dr. Smalldon's diagnoses. Dr. Eshbaugh described the mitigation evidence as "quite typical." Dr. Eshbaugh had one advantage that Dr. Smalldon did not, however. Dr. Eshbaugh had the benefit of hindsight to see that the trial court was not convinced that evidence of Wesson's brain injuries was substantial enough to mitigate his sentence.

{¶106} Dr. Eshbaugh wrote in his report that he would have highlighted the antisocial personality diagnosis and what that meant for Wesson's conduct. While that may have been one approach, it was certainly not the only approach. In fact, at least one court has characterized evidence of antisocial personality disorder as "not 'good' mitigation" evidence. (Internal quotations omitted) *Morton*, 684 F.3d at 1168. The defendant in *Morton* argued that his attorneys were ineffective because they called a doctor to testify about his antisocial personality disorder, which he described as "no more mitigating than being 'evil' is mitigating." *Id.* at 1167-

68. The Eleventh Circuit disagreed, noting that his attorneys chose a mitigation strategy that many lawyers argue is effective. *Id.* at 1168.

{¶107} The Ohio Supreme Court has also considered mitigation evidence about antisocial personality disorder. *See, e.g., State v. Campbell*, 95 Ohio St.3d 48, 57 (2002). In *Campbell*, another case in which Dr. Smalldon testified, the Supreme Court considered Dr. Smalldon's testimony about antisocial personality disorder. Dr. Smalldon testified in that case that many people with this disorder "function in society and do not commit crimes," an argument similar to the one the prosecutor made in this case. *Id.* The Ohio Supreme Court concluded that the defendant's "antisocial personality disorder deserves little weight [in mitigation]." *Id. See, e.g., State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 175 (Court gave little weight to this disorder and cited other cases reaching the same result).

{¶108} Dr. Smalldon and Dr. Eshbaugh reached the same diagnoses and conclusions. Trial counsel opted to present evidence of Wesson's four significant brain injuries and evidence of his antisocial personality disorder. Postconviction counsel have argued that trial counsel should have focused more on antisocial personality disorder and Dr. Eshbaugh wrote that he would have minimized his reliance on Wesson's undocumented brain injuries. There may be reasonable justifications for both approaches, but several decisions have concluded that evidence of antisocial personality disorder is of limited value in mitigation. In addition, hindsight cannot affect the evaluation of the performance of trial counsel. Just because trial counsels' approach turned out to be unsuccessful does not mean that they provided ineffective assistance of counsel. Trial counsels' approach presented the trial court with valuable mitigation evidence without focusing on the antisocial personality disorder evidence. Because the Ohio Supreme Court has

routinely concluded that this evidence deserves little weight in mitigation, trial counsels' strategy did not deprive Wesson of the effective assistance of counsel.

{¶109} Wesson has not demonstrated that he was denied the effective assistance of counsel as alleged in his fourth ground for relief. Accordingly, the trial court did not abuse its discretion in dismissing the petition without a hearing.

### Conclusion

{¶110} We have reviewed the record and conclude that the trial court's findings are supported by competent and credible evidence. We also conclude that the trial court did not abuse its discretion in regard to its gatekeeping function by dismissing the petition without a hearing. Accordingly, Wesson's first assignment of error is overruled.

### Assignment of Error No. 2

The trial court erred in dismissing appellant's post-conviction petition without holding an evidentiary hearing and affording him the opportunity to conduct discovery.

{¶111} In his second assignment of error, Wesson argued that the trial court erred when it denied his petition without allowing him to conduct discovery. This Court has long held that there is no right to discovery in a postconviction proceeding. *State v. Craig*, Ninth Dist. No. 24580, 2010-Ohio-1169, ¶ 6. An action for postconviction relief is a civil action. *State v. Milanovich*, 42 Ohio St.2d 46, 49 (1975). The procedures applicable to the action, however, are those found in R.C. 2953.21. *State v. Hiltbrand*, Ninth Dist. No. 11550, 1984 WL 6171 (May 16, 1984). That section does not provide for discovery. *Craig* at ¶ 6.

{¶112} Wesson had no right to conduct discovery. Accordingly, the trial court did not err in denying his petition without first allowing him to conduct discovery. Wesson's second assignment of error is overruled.

**Assignment of Error No. 3**

Considered together, the cumulative errors set forth in appellant's substantive grounds for relief merit reversal or remand for a proper post-conviction process.

{¶113} Wesson argued that the cumulative effect of the errors asserted in his eleven grounds for relief deprived him of his constitutional right to a fair hearing. The Ohio Supreme Court has recognized the cumulative error doctrine. *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus. *See, also, State v. Phillips*, Ninth Dist. No. 20692, 2002 WL 274637, *13 (Feb. 27, 2002). According to this doctrine, errors during trial, "singularly, may not rise to the level of prejudicial error, [but] a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial." *Id.* at 196-97. "[E]ven to consider whether 'cumulative' error is present, [the court] would first have to find that multiple errors were committed in this case." *State v. Madrigal*, 87 Ohio St.3d 378, 398 (2000). The trial court, having found no error in the eleven grounds for relief, rejected Wesson's cumulative error ground for relief. After our review of the grounds for relief, we conclude that the trial court did not err in so concluding. Wesson's third assignment of error is overruled.

## III.

{¶114} Wesson's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
CARLA MOORE
FOR THE COURT

WHITMORE, P. J.
BELFANCE, J.
CONCUR.


APPEARANCES:

JENNIFER A. PRILLO and KELLE A. HINDERER, Assistant State Public Defenders, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.